CORN BELT TRUST & SAVINGS BANK OF BELLE PLAINE, Appellant, v. JAMES S. MAY et al., Appellees.

MATILDA WURTELE, Appellee, v. MINNIE WURTELE et al., Appellees; CORN BELT TRUST & SAVINGS BANK, Appellant.

MORTGAGES: Lien and Priority—Subsequent Advancements. A real
1 estate mortgage given to a mortgagee who in good faith takes the same to secure present and *future-agreed* advancements of money to the mortgagor (even though the mortgage does not reveal such fact), and duly records the same, will be decreed to be prior in right to a subsequent mortgage of which he had no *actual* notice or warning, even as to advancements made in good faith *after the execution of such subsequent mortgage.*

**DESCENT AND DISTRIBUTION:** Surviving Spouse—Conditional Oc-
cupancy of Homestead—Effect.   The presumption that a widow
took, upon the death of her husband, a one-third interest in fee in
his property is not overcome by proof that for some ten years she
and her children continued to occupy the property in common,
under an agreement to defer partition.

*Appeal from Benton District Court.*—B. F. CUMMINGS, Judge.

## JANUARY 15, 1924.

THE first action is to foreclose a mortgage given to the
plaintiff, plaintiff claiming that its mortgage, though subsequent
in point of time, should be decreed prior and superior to certain
mortgages given to the defendant Tobin.   Plaintiff also claimed
that the widow, Minnie Wurtele, elected to take a part of the
land as her homestead, and waived and was estopped from
claiming dower therein.   The widow filed a cross-petition, al-
leging that she had not elected to take homestead, but that she
was entitled to her distributive share in the 560 acres of land
left by her husband.   Tobin, trustee, also filed cross-petition,
asking foreclosure of his mortgages.

The second case was an action in partition, brought by one
of the heirs against the widow and other heirs, wherein Tobin,
trustee, was made a party defendant.   In the partition case the
widow made the same claim, and the court therein found and
decreed that she had not elected to take homestead.   We take it
that the appellant bank was not a party to that proceeding, and
it was stipulated herein that the question as to election should
be tried on the same evidence submitted in the partition suit.
The court, the same judge presiding, again found that there
was no election.

The cases were consolidated by agreement in the district
court, and they have been consolidated here, and were sub-
mitted together.   The trial court decreed foreclosure of plain-
tiff's mortgage, and one of the mortgages of the defendant Tobin,
trustee, about which there seems to be little, if any, contro-
versy now; also decreed a foreclosure of the $30,000 mortgage
of Tobin, trustee, to the extent of about $14,000, and that said
mortgages of Tobin, trustee, were in good faith, free from

fraud and wrong, and prior and paramount to the claim of appellant bank; also decreed that the widow was entitled to her distributive share in the land, and decreed partition.

This, in brief, states the issues and the decrees, which take up 110 pages of the abstract. The bank appeals.—*Affirmed.*

*Snyder & Snyder* and *Nichols & Nichols,* for appellant.

*Tobin, Tobin & Tobin, Charles E. Hughes,* and *R. S. Milner,* for appellees.

PRESTON, J.—The appellant does not now claim that the first mortgage of Tobin was fraudulent, nor does it claim that there was any actual fraud in the $30,000 mortgage. There is some claim that there was constructive fraud as to it, or, as counsel put it, that it is and should be subsequent to the appellant's mortgage. The principal controversy here is as to the $30,000 mortgage and the alleged election by the widow to take homestead in part of the property.

The appellant states the two propositions substantially as we have stated them. They state that the court was in error in holding that Minnie Wurtele was entitled to an undivided one-third interest in the real estate left by her deceased husband, and second, in holding that the mortgage of Tobin, trustee, known as the $30,000 mortgage, was a superior lien to that of the appellant's mortgage.

We shall proceed at once to a consideration of what we conceive to be the controlling points in the case.

It should be first stated that plaintiff assumed the burden of showing the alleged priority of its mortgage in the first case, and in the second, that it concedes that distributive share is the primary right of the widow, and assumed the burden to show the alleged election to take homestead. To do this, it was compelled to, or at least did, go into the camp of its adversaries. No witnesses were called by the defendant. The evidence to establish plaintiff's claim consists, for the most part, of the testimony of appellees Matilda Wurtele and Emma L. May, daughters of Jacob Wurtele, deceased, and the testimony of plaintiff's attorney. One of the Wurteles and two other wit-

nesses testified briefly. It is contended by appellant that ap-
pellees, called by it as witnesses, gave evasive testimony, and
that the attorney contradicted some of the statements made by
them as to conversations had between them. There may be some
variation in the testimony of the two main witnesses and par-
ties, but we think there is no substantial variance. The trial
court, in the exercise of its discretion, practically permitted
counsel for appellant to cross-examine the parties called in its
behalf. In view of the large record, we shall not attempt to
state the evidence in detail, but state our conclusions.

1. There was a first mortgage of $10,000 on the land, which
was a prior lien to the Tobin mortgages, which is not the subject
of controversy. The first mortgage to Tobin, trustee, was dated
March 1, 1920. It was duly recorded on March
1. MORTGAGES: 5, 1920. The second mortgage, of $30,000, was
lien and pri-
ority: subsequent dated December 23, 1920, and recorded on the
advancements. 27th. The plaintiff's mortgage was dated March 9, 1921, and
recorded on the 10th, and is for $11,276.04. The plaintiff's
mortgage was given for prior indebtedness due from the mort-
gagors to plaintiff bank, some of which dated back as early as
1908. The bank paid nothing at the time of the execution of
its mortgage. The mortgages were executed by James S. May
and Emma L. May on their interest in the land of Jacob Wur-
tele, deceased. Although they had given but three mortgages,
prior to plaintiff's mortgage, plaintiff's mortgage recites that
it was subject to all mortgages except three mortgages, one for
$10,000, one for $15,000, and one for $30,000. The explanation
of this is that it was supposed that all three were fraudulent,
and this was so written to protect the bank. But this shows
notice to the bank of the three prior mortgages. There is other
evidence tending to show notice to the bank, which will be re-
ferred to later.

We think there is no evidence which fairly contradicts the
claim of Tobin, trustee, that he paid to the Mays $14,250.73. Of
this amount approximately $3,200 was paid prior to the execu-
tion and recording of plaintiff's mortgage, and the balance
afterwards. Between $100 and $200 was advanced after the
suit was brought, but appellees made no claim for that, and it
was not included in the judgment. Appellant contends that

it is entitled to priority as to the whole amount, and especially so as to the amounts paid after its mortgage was executed and recorded. It is contended by appellant that the payments of money by Tobin to the Mays under the $30,000 mortgage were mere voluntary payments, and that, even though there was no actual fraud in giving the $30,000 mortgage, it is a suspicious circumstance, and at least constructive fraud, since it tended to hinder plaintiff, as a creditor, in the collection of its claim. The $30,000 mortgage does not show on its face that it was given for advances to be made.

No Iowa authorities are cited by either side on this proposition, except that appellees cite *Smith v. Moore*, 112 Iowa 60, to the point that a mortgage executed to secure a pre-existing debt does not constitute the mortgagee a bona-fide purchaser, or entitled to any priority as such. It is conceded by appellant that there is no doubt as to the validity of a mortgage providing for future advances, and that, if there was an agreement by Tobin to make an advancement, he had the right to make the advances, notwithstanding subsequent mortgages or other liens; but they say that, if there is no such agreement, then no advancements can be made as against the mortgage of subsequent date, after notice of the latter. They cite 27 Cyc. 1178 and 1179. They contend also that the notice of the later mortgage can be either actual or constructive, and that the recording of the later mortgage is such constructive notice, citing 27 Cyc. 1179, 1180. They concede that there are cases holding that constructive notice is not sufficient, but contend that this rule is applied only where the mortgage of earlier date discloses that it is one for future advances. 3 Pomeroy on Equity Jurisprudence (3d Ed.), Section 1199, and other cases.

On the other hand, appellee advances the following propositions, with authorities to support them: That a mortgage given to secure future advances, in good faith, and properly recorded, is valid as between the parties to it and as to subsequent incumbrancers, and that the rule holds even though the mortgage does not, on its face, disclose that it was given to secure future advances (citing 19 Ruling Case Law 286, 393; *Dummer v. Smedley*, 110 Mich. 466 [68 N. W. 260]; *Minor v. Sheehan*, 30 Minn. 419 [15 N. W. 687]; *Perkins & M. Co. v. Drew*, [Ky.]

122 S. W. 526; *Du Bois v. First Nat. Bank,* 43 Col. 400 [96 Pac. 169]; *Union Nat. Bank v. Moline, M. & S. Co.,* 7 N. D. 201 [73 N. W. 527]; *Scofield Imp. Co. v. Minot Farmers Grain Assn.,* 31 N. D. 605 [154 N. W. 527]; *Good v. Woodruff,* 208 Ill. App. 147; *Tully v. Harloe,* 35 Cal. 302 [95 Am. Dec. 102]). Again, that, where a mortgage is given to secure future advances, the filing of a subsequent mortgage is not constructive notice to the prior mortgagee, so as to postpone the lien of his mortgage for advances made thereafter, even though such advances are optional, and not obligatory. The prior mortgagee is affected only by actual notice of the subsequent mortgage, and the burden is on the subsequent mortgagee to prove such notice. 19 Ruling Case Law 393, 429, 431; *Anderson v. Liston,* 69 Minn. 82 (72 N. W. 52); *Tapia v. Demartini,* 77 Cal. 383; *McDaniels v. Colvin,* 16 Vt. 300 (42 Am. Dec. 512); *Union Nat. Bank v. Moline, M. & S. Co.,* supra; 1 Jones on Mortgages (6th Ed.), Sections 372, 373; 3 Pomeroy's Equity Jurisprudence (3d Ed.), Sections 1197, 1199.

Our own statute seems to lend support to this doctrine, and to hold that constructive notice because of recording applies to prior incumbrancers. Code Section 2925. The evidence in the instant case, we think, fails to show actual notice to Tobin, trustee. Appellee also contends that persons interested in limiting advances under a prior mortgage for future advances can do so only by giving actual notice to that effect. The prior mortgagee is not required to search the record before each advancement. 19 Ruling Case Law 430; *McDaniels v. Colvin,* supra. The reason for this, we take it, is that the prior mortgagee may protect himself. The record does not show that Tobin, trustee, had actual notice of plaintiff's mortgage. As said, the plaintiff had constructive notice of appellees' mortgages, and there is evidence tending to show that plaintiff had actual notice that Tobin's $30,000 mortgage was to cover future advances. Appellant concedes that it was informed by the Mays that only $3,500 had been advanced on the $30,000 mortgage. This statement by the makers would not bind Tobin, who was not present at the conversation. Appellant made no inquiry of Tobin, the one most likely to know, as to the amount advanced or to be advanced, or as to the terms of the agreement. Appel-

lant concedes that, had anyone suggested to it that there were to be further advances, there would be reason for saying that appellant should have given appellee Tobin actual notice or warning not to make further advances. Appellant having actual and constructive notice of the $30,000 mortgage, we think there was a burden upon appellant to inquire, as will be shown later.

It is further contended by appellee that the plaintiff was bound by the constructive notice of the prior mortgages, and that it failed to make inquiry, and failed to give notice. Therefore it took subsequent to Tobin's mortgages, and subject to all rights that had accrued and could thereafter lawfully accrue under the prior mortgage. *Kentucky Lbr. & M. W. Co. v. Kentucky Title Sav. Bk. & Tr. Co.*, 184 Ky. 244 (211 S. W. 765, 5 A. L. R. 397); *Hall v. Williamson Groc. Co.*, 69 W. Va. 671 (72 S. E. 780). The authorities hold that the agreement that future advances shall be secured need not even be reduced to writing, but may be shown by parol evidence. 19 Ruling Case Law 393; *Dummer v. Smedley*, supra, and other cases supra, cited in connection with it; 27 Cyc. 1070; *Simms v. Ramsey*, 79 W. Va. 267 (90 S. E. 842). In the last named case, it is held that an existing indebtedness, a verbal agreement to make future advances in any form, or a verbal agreement to become surety in consideration of the indemnity to be afforded by it, constitutes a valid and sufficient basis for a mortgage or deed of trust for a definite and specific sum, purporting to be an absolute debt, and that all three of such purposes may be included in a single mortgage.

It is also held that a mortgage cannot secure future advances unless it was intended to do so at the time of its execution. 19 Ruling Case Law 393. In the instant case, the evidence shows that such was the intention of the Mays and of Tobin.

It seems to be well settled that a mortgage to secure future advances, even though it does not disclose such purpose on its face, is valid between the parties, or as against any subsequent incumbrancer not prejudiced thereby. In such a case, it is held that there is no contravention of registry, as the register is not intended as notice of the *amount* actually due on a mortgage. The omission to state the object subjects the mortgage to sus-

picion, and the holder will be put to strict proof of the payment of the consideration. But the rule obtains that, if the mortgage gives such information that, by inspection of the record, and by the exercise of common prudence and ordinary diligence, the extent of the incumbrance may be ascertained, although the instrument may not truthfully state its object on its face, if the transaction is otherwise fair, there is nothing inequitable in enforcing it. 19 Ruling Case Law 286, and cases there cited.

We may say in passing that, in the instant case, the appellant had both actual and constructive notice of the Tobin mortgage in question. This, under the authority last cited, was sufficient to put the plaintiff upon inquiry. There is some evidence tending to show that inquiry was made of one of the Mays as to the amount due, but May was unable to state the amount. The plaintiff could readily have inquired of Tobin, and thus obtained the information. This was not done. Neither did plaintiff give Tobin actual notice of its mortgage. We are satisfied from the evidence that Tobin paid out the money in the amount found by the trial court, and that there was no bad faith on his part. Some of the cases hold that actual notice to the prior mortgagee was required, while others hold that constructive notice is sufficient. In some of the cases, the question of intention is considered important. In the instant case, we have no doubt that it was the intention, as between Tobin and the mortgagors, that, in the execution of the $30,000 mortgage, Tobin was to make advances to help the mortgagors out of their financial difficulties, as they should arise.

It is stated in 27 Cyc. 1066, 1067:

"An indemnity mortgage may be given to secure the mortgagee, not only as against debts or liabilities for which he has already assumed responsibility or liability, but also to protect him against loss or damage on indorsements, suretyships, or other liabilities which he may in the future enter into for the benefit of the mortgagor; and when this intention is apparent, the mortgage will cover such future obligations as soon as they are incurred or become fixed."

In *Madigan v. Mead*, 31 Minn. 94 (16 N. W. 539), it was held that the mortgagee need not be absolutely bound to make the contemplated advances; that, as between the original par-

ties at least, the mortgage will be a valid security, although the making of the advances was left to his option or discretion. Other cases hold that a binding obligation is necessary, to protect the prior mortgagee in regard to advances made after the junior mortgage lien attaches. 27 Cyc. 1179, and numerous cases. See, also, 27 Cyc. 1070, where it is further stated that:

"The validity of the mortgage is not necessarily impaired by the fact that it does not show upon its face the real character of the transaction. Although it recites an existing debt as its consideration, it may be shown that it was intended to cover future advances, and the mortgagee can recover the amount actually advanced up to the time of enforcing the security. The question of good faith is always open to inquiry, but the mere fact that the mortgage was given to secure future advances, while it recites a present debt, or that it was given for a larger amount than was loaned at the time, and with a view of covering future loans, is not conclusive of fraud. * * * A mortgage for a sum certain, given in good faith, as security for future advances, is valid, as against general creditors of the mortgagor, for advances not exceeding the sum specified in the mortgage, and also as against third persons acquiring an interest in the mortgaged premises, by mortgage, * * * at least up to the time their interest attaches and notice thereof is given to the mortgagee." 27 Cyc. 1070, 1071.

See, also, *Lanahan v. Lawton*, 50 N. J. Eq. 276 (23 Atl. 476).

In *Fuller v. Griffith*, 91 Iowa 632, 637, we said:

"We do not mean to hold that the parties might not have made a subsequent agreement with reference to future advances, although not contemplated at the time the conveyance was made, which would have been valid, and binding against plaintiff until he obtained his judgment and a lien upon the land. What we do mean is that there is not sufficient proof of such an agreement. * * * Plaintiff contends that the court erred in giving defendant Knapp a first lien of $425 upon the land. There would be much of merit in his contention, had we found the conveyance tainted with actual fraud; but, as we do not so find, the policy of the law is to protect the purchaser or mortgagee to the amount of money actually paid or advanced by him, where the mortgage

or deed is attended with suspicious or inequitable circumstances, or is only constructively fraudulent.''

Perhaps it would be well to refer here to some additional facts. It appears that, in the early part of 1920, the defendants May had become involved. Most of the indebtedness grew out of contracts entered into by them for the purchase of different farms. They appealed to Tobin for money to finance them. Tobin advanced the $15,000 before referred to, and took the $30,000 mortgage for future advances. At the time Tobin took the mortgage, he had no knowledge of the indebtedness of the Mays to appellant bank. We have already shown that appellant had actual notice of the two Tobin mortgages. Appellant's cashier testifies that the reason they took its mortgage was because the mortgagors had given the Tobin mortgages; that the mortgages were piling up, and the Mays were implicated in land deals, and not getting along very well, so the plaintiff took its mortgage, to secure itself as best it could. Appellant and its officers and attorney seem to have had an intimate knowledge of the situation. In addition to the testimony before set out, the attorney for appellant, who was also a stockholder, director, and also on the examining committee of the bank, testifies that he drew the appellant's mortgage, and that he had a conversation with the Mays prior thereto; that they told him that they had been paid only $3,500 on the $30,000 mortgage, and further, that they had a contract with Tobin in regard to the $30,000 mortgage about *furnishing money*, but that they didn't have the contract with them, and could not remember its terms. The attorney did see the contract, however, before the mortgage was executed, and the verbal testimony shows that there was a definite agreement between Tobin and the Mays as to future advances. Mr. Snyder further testifies that, before the bank took its mortgage, he had a conversation with the Mays in the bank, and that the cashier of the bank was present, wherein they talked about the mortgages; and he says that he had heard of the mortgages before that conversation, and that he asked a good many questions of Mr. and Mrs. May, to find out what their mortgages were, what money they had received on them, and all the items he could think of, pertaining to these mortgages. But, as before stated, no inquiry was made of Tobin himself as

to what the agreement was, or the amount of money advanced or to be advanced. No notice or warning was given to Tobin not to make further advances. Before appellant's foreclosure action was brought, it knew that Tobin was not claiming the full amount of the $30,000 under the mortgage, and knew that Tobin had advanced $14,000 or more under it. Plaintiff's attorney saw an itemized statement of the money so advanced. Appellee Tobin contends that there was an agreement by which he was bound to furnish the Mays the money. The evidence is clear that such. is the fact. The Mays testify that it was the agreement that Tobin was to advance money on their land deals and certain things that he agreed to do. It does not appear to be established that, at the time the mortgage was executed, there was any agreement as to a definite amount which should be advanced.

Appellee Tobin also contends that, under all the circumstances surrounding this case, whether he agreed to furnish the money or not, in equity and fair dealing he should be protected, and his mortgages decreed to be superior to the bank's mortgage.

At the time of the execution of the $30,000 mortgage, December 23, 1920, Tobin gave Mrs. May and her husband a writing which recited the purpose of giving the mortgage, and that it was to cover certain specified items therein, amounting to approximately $7,000, and to secure all additional sums of money which Tobin should pay out in an effort to finance their business, some of which was to be thereafter paid. To this extent, then, a definite amount was fixed. The instrument further recites that it was understood that Tobin expected to pay their creditors, to save them from trouble and expense; that it was understood and agreed that Tobin had no interest in the mortgage, except such sums as are represented by the notes above referred to, and in addition, such sums as may be actually paid out for them, including expenses and costs. The instrument is too long to quote in full. It appears that the purpose of this was for the protection of the Mays, in case of the death of Tobin. It does not purport to contain all the verbal agreement which the testimony shows was had, prior to its execution.

There may be other circumstances that are not mentioned in detail. From the entire record, we are abundantly satisfied

that the equities are with appellees. Though there is some conflict in the authorities as to some of the points in the case, and even though it does not appear that there, was any definite agreement as to the exact amount which Tobin was to advance, there was an agreement by which Tobin obligated himself to make advances, and this he did, to the amount stated, and in good faith. Appellant had notice, as before stated, and gave no notice or warning to Tobin not to advance further sums after the execution of its mortgage. Because of these matters, and all the facts and circumstances in the case, we think that the appellee Tobin should be protected for the money advanced, as found by the trial court, and that, as to the first case, the decree should be affirmed.

2. We stated at the beginning the two main points most relied upon by appellant. There are two other matters argued to some extent, which perhaps should be noticed briefly. In appellant's reply argument in the second case, it is thought that the widow, by occupying the premises more than ten years before she asserted her claim in the partition suit, is barred from now claiming her distributive share in the land of deceased. They cite *Britt v. Gordon*, 132 Iowa 431. It was there held that an action in equity for the admeasurement of the widow's dower, as against a stranger who was claiming the entire estate, is governed by the general statute of limitations, and must be brought within ten years from the death of the husband. It is enough to say that that is not this case.

It is also thought by appellant that the widow is estopped to make such a claim because of her occupancy of the premises without any administration of her husband's estate, and because of certain statements made to the officers of appellant by one of the heirs. The widow was not bound by such a statement. Furthermore, it appears that the bank did not rely thereon or change its position by reason thereof. We shall refer to the question of her occupancy of the land, in the next division of the opinion.

We think there is no substantial merit in either of the questions as to the statute of limitations or estoppel; so we will pass to the question of the alleged election of the widow to take her homestead right.

3. As said, appellant denied that the widow was entitled to a one-third interest in the lands, and alleged that she had waived her dower right in the land, and had elected to take her homestead right, in lieu of dower. The widow contends that she occupied the premises under an agreement with the other heirs, which will be referred to in a moment. The appellant assumed the burden of proof on this question, and sought to show that the widow had elected to take the homestead. This the appellant sought to do by calling some of the heirs as its own witnesses. It is thought by appellant that their story was shaken somewhat by the examination, in the nature of cross-examination, by plaintiff. Attorney for plaintiff, as a witness, contradicted some of their statements; but his testimony is somewhat in the nature of conclusions and arguments. We think it is fairly established by the evidence that there was such an agreement between the widow and the heirs. It does not appear that the widow ever claimed a homestead right.

2. DESCENT AND DISTRIBUTION: surviving spouse: conditional occupancy of homestead: effect.

The agreement, made soon after the decease of Jacob Wurtele, was that the widow and heirs should allow matters to stand, for the time being, as they had stood before the father's death,—that is, to allow the May family and Frank Wurtele to continue in possession of the land they had been occupying, while the widow and the daughter Matilda, with the daughter Sadie, occupied the home place, near Belle Plaine, and that this arrangement should be continued as long as it proved satisfactory to all concerned; that, in case any one of them became dissatisfied with the arrangement, then it was to be terminated, and the mother was to receive her one third of the land, and the children one sixth each; and that, in straightening the matter up, the indebtedness was to be taken into consideration. At the time of Jacob's death, he was indebted to the amount of about $15,000, which was taken over and transferred to the widow and Matilda, who gave their own notes therefor. Matilda acted for the family, and collected the rents and paid the taxes and interest out of the collections, all of which was a part of the arrangement. At the time of the trial, this indebtedness, for which the mother and Matilda were obligated, had increased to $23,000. Some of the heirs became dissatisfied

with the arrangement, and the partition suit followed, wherein the widow asserted her right to dower.

It is conceded that the right to distributive share is the primary right, and that the election must be as to the homestead, and that the right to the distributive share continues until an election is made. It may be conceded that, as we said in *Gray v. Wright*, 142 Iowa 225, 227, and *Joslin v. Beam*, 187 Iowa 1090, 1099, ordinarily an election to take the homestead right is evidenced by the continued occupancy of the premises as a homestead by the surviving spouse and family; but this is not conclusive. Whether a widow takes her distributive third right or the homestead right, there is a presumption, in the absence of evidence, that she took the former; and to overthrow the presumption, it must be shown that there was an election to take the homestead. If occupancy is relied upon to show such election, it must be such occupancy as is not only consistent with the homestead right, but an occupancy maintained under and because of such right. In the instant case, we think that the appellant has not established its claim that the widow elected to take her homestead right. Her occupancy thereof is referable to the agreement before stated.

We think the case is ruled at this point by *Bosworth v. Blaine*, 170 Iowa 296, and *Joslin v. Beam*, supra.

Perhaps it should be said that the dower right in 560 acres of land would be more beneficial to the widow than the homestead right. Some of the cases say that consideration should be given to the presumption that a person shall be held to intend to do that which is most beneficial.

Further discussion is unnecessary. The judgment of the district court is affirmed in both cases.—*Affirmed*.

STEVENS and VERMILION, JJ., concur.

DE GRAFF, J., concurs specially.

DE GRAFF, J. (specially concurring). I concur in the conclusion announced. There can be no question as to the validity of a mortgage to secure future advances or liabilities. It is a recognized form of security; and although a mortgage of this

character has frequently been regarded with jealousy, and carefully scrutinized by courts of last resort, its validity is quite universally accepted. In the instant case, the legality of the mortgage is not questioned upon the ground that there was in fact no valid consideration. It is well established that the real consideration in a mortgage or deed may be shown by parol, although different from that expressed in the instrument itself. The Tobin mortgage was recorded. It antedated plaintiff's mortgage. We are not dealing with a condition in a mortgage. It recited a definite consideration, greater in fact than the amount of money then advanced, but under an agreement not expressed in the mortgage, that the consideration named should cover future advances or loans made by the mortgagee. The mortgage gave notice of an incumbrance,—nothing more. This case does not involve the frequently stated rule that the condition of a mortgage must give reasonable notice of the incumbrance, and upon application to the record by a third party, he may acquire all the information which his interest demands. It is well settled that a party investigating the record of a mortgage must have the power of knowing from this source the subject-matter of the mortgage, and the incumbrance on the property must be so defined as to prevent the substitution of everything which a fraudulent grantor may devise to shield himself from the demands of his creditors. There is no fraud pleaded or proved in the case at bar. The plaintiff could know nothing from an examination of the record as to future advances, but it did have knowledge of the agreement between the parties to that mortgage, and was bound to seek definite information from the parties who were in a position to give it. If they failed or refused, they would be estopped. Briefly stated, plaintiff, as an inquiring creditor, could not know from the record the precise incumbrance then in existence, but it had notice of certain definite facts which point to and guide it in the necessary investigation of the subject. We must not confuse a case of this character with conditions in mortgage deeds that neither communicate any certain information nor point out any path in pursuit of which information may be obtained. We are not dealing with the policy of our recording system, nor with the proposition whether the condition of the mortgage is described

with such reasonable certainty that in respect to it a subsequent mortgagee is legally affected with notice. In the principle of constructive notice of the record, a subsequent mortgagee must be supposed to have read the mortgage with its condition, which must give reasonable notice. With this criterion we are not concerned. The Tobin mortgage did possess an uncertainty in the description of the obligation. The sum of the indebtedness was specified in the Tobin mortgage, but it was stated as a present and existing indebtedness, which was not the fact. Plaintiff, however, was informed, prior to the execution of the second mortgage, and from the mouth of his mortgagor, that an agreement existed between the latter and Tobin that the amount stated did not represent his actual loan, but was intended to cover future advances, and that as to the amount that had been advanced, the mortgagor was not certain. What more could a recorded condition do? It was clearly the intent of the parties to the Tobin mortgage, and so communicated to plaintiff, that the lands described should stand as security for all advances made by Tobin to the mortgagor. If there was in fact no legal mortgage in this respect, there was undeniably an equitable one, which a court of equity would enforce against the original parties to it, and against all others not in the condition of bona-fide purchasers or subsequent incumbrancers without notice. It is not necessary to the validity of a mortgage that it should truly state the debt it is intended to secure, but it stands as a security for the real equitable claims of the mortgagee, whether they existed at the date of the mortgage or arose afterwards, upon the faith of the mortgage, before notice of an equity subsequently claimed. In *Shirras v. Caig,* 7 Cranch (U. S.) 34, Chief Justice Marshall, in delivering the opinion of the court, said:

"It is true that the real transaction does not appear on the face of the mortgage. The deed purports to secure a debt of 30,000 pounds. * * * It was really intended to secure different sums, due at the time to particular mortgagees, advances afterwards to be made, and liabilities to be incurred to an uncertain amount. It is not denied that a deed which misrepresents the transaction it recites and the consideration on which it is executed is liable to suspicion. It must sustain a rigorous examination. It is, certainly, always advisable fairly and plainly to

state the truth. But if, upon investigation, the real transaction shall appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed, of his real, equitable rights, unless it be in favor of a person who has been, in fact, injured and deceived by the misrepresentation.''

It is said in *Williamson v. Brown,* 15 N. Y. 354:

''The true doctrine on this subject is that, where a purchaser has knowledge of any fact sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase, he is presumed either to have made the inquiry and ascertained the extent of such prior right, or· to have been guilty of a degree of negligence equally fatal to his claim to be considered as a bona-fide purchaser.''

There is nothing unusual in the facts before us. It is frequent for a person who expects to become more heavily indebted to mortgage his property as security for debts to be contracted, as well as for those already due. In the instant case, there is no pretense, and could be none, that the Tobin mortgage was not valid between the parties to it. A subsequent incumbrancer with notice of an outstanding equity cannot acquire a superior right. We will concede that the true amount of the debt should be stated, and under the instant facts, a recital that the mortgage was intended to cover future advances; but the Tobin mortgage was valid between the parties, and the plaintiff had actual notice of the original intendment. The defendants are entitled to priority over plaintiff's mortgage, in accordance with well settled rules of law and a uniform current of decision.